

# In the United States Court of Federal Claims

No. 17-766T
(Filed: December 12, 2017)
NOT FOR PUBLICATION

**FILED**

**DEC 1 2 2017**

U.S. COURT OF
FEDERAL CLAIMS

```
*************************************
KIRELL FRANCIS BETTIS,              *
                                    *
                Plaintiff,          *
                                    *    Pro Se Plaintiff; Motion to Dismiss; RCFC
v.                                  *    12(b)(1); Tax Refund; Flora Full Payment
                                    *    Rule
THE UNITED STATES,                  *
                                    *
                Defendant.          *
*************************************
```

## OPINION AND ORDER

This case stems from an alleged wrongful denial by the Internal Revenue Service ("IRS") of a tax refund claim filed by plaintiff Kirell Francis Bettis (a/k/a Kirell Francis Taylor or Kirell Francis Bettis-Taylor) as trustee of the Kirell Francis Bettis Trust (the "Trust"). Plaintiff seeks the refund of an alleged $1,208,796,038 overpayment of payroll and income taxes for the 2015 tax year. Defendant seeks dismissal of the suit under Rule 12(b)(1) of the Rules of the United States Court of Federal Claims ("RCFC"). As explained below, because plaintiff has not paid his tax liability prior to seeking relief in the United States Court of Federal Claims ("Court of Federal Claims"), the court lacks jurisdiction to entertain plaintiff's claims and therefore must dismiss plaintiff's complaint.

### I. BACKGROUND

Plaintiff alleges that he owns a financial instrument worth $850 billion, from which he derives an annual fiduciary fee of $5,162,202,116. Compl. ¶¶ 1-2. The "asset" is purportedly a "Floating Irrevocable Letter of Credit" issued by the State of California on April 4, 1878 (the "Instrument"), and was intended to be a "thirty-year public finance transaction" effective beginning on "the first date of bookkeeping of any credit transaction with any public or private person or entity," but no later than April 4, 2045. Pl.'s Resp. to Def.'s Mot. to Dimiss ("Pl.'s Resp.") Ex. A at 13.[1] The Instrument had previously been "lost" but was later "found" by

---

[1] The exhibits attached to plaintiff's response were not separately numbered. Plaintiff instead numbered his response and attached exhibits consecutively, as if they were all one document. The court refers to the page numbers designated by plaintiff.

plaintiff. Compl. Ex. A at 6.[2] The Instrument provides for its possessor to sign the name of California Governor William Irwin "on [the governor's] behalf" and to affix the name of the possessor to the face of the Instrument.[3] Pl.'s Resp. Ex. A at 13. Plaintiff appears to have signed William Irwin's name and affixed the name of the Trust to the face of the Instrument on June 17, 1999. Id. Plaintiff subsequently executed, effective January 1, 2014, a rider that purportedly shortened the obligation period to seventeen years, providing approximately $50 billion in original issue discount ("OID") interest annually. See id. at 15-19. The alleged "withholding" of the 2014 OID interest ostensibly created income for 2015, id. at 12, the year at issue in the instant case.

For 2014 and 2015, the OID interest income flowing from the Instrument totaled $102,720,000,000. Compl. ¶ 2. Of that amount, plaintiff allocated $48,778,898,943 to the United States Treasury and $48,778,898,941 to the California Franchise Tax Board, and charged the Trust a "fiduciary fee" of $5,162,202,116. Id. ¶¶ 2, 17. Plaintiff then sought to monetize his fiduciary fee by effecting various tax filings on behalf of the Trust.

Plaintiff filed a Form 941, Employer's Quarterly Federal Tax Return, on behalf of the Trust for each quarter of 2015 on February 22, 2016. Pl.'s Resp. Ex. B at 26-33. That same day, plaintiff also filed a Form 945, Annual Return of Withheld Federal Income Tax, on behalf of the Trust for the 2015 tax year.[4] Id. at 33-34. However, no 1099, W-2, or other filing was effected, id. at 35 (plaintiff's individual Wage and Income Transcript for 2015), and plaintiff did not file an individual income tax return for 2015, id. at 36 (plaintiff's individual Tax Account Transcript for 2015). In his filings, plaintiff reported the following approximate tax liabilities:

- Form 941, first quarter 2015—$1.143 billion, id. at 26;

- Form 941, second quarter 2015—$1.153 billion, id. at 28;

- Form 941, third quarter 2015—$370 million, id. at 30;

- Form 941, fourth quarter 2015—$370 million, id. at 32; and

---

[2] The exhibits attached to plaintiff's complaint were not separately numbered. Plaintiff instead numbered his complaint and attached exhibits consecutively, as if they were all one document. The court refers to the page numbers designated by plaintiff.

[3] Pursuant to Rule 201 of the Federal Rules of Evidence, the court takes judicial notice that William Irwin was indeed the governor of California on April 4, 1878. See, e.g., California State Library, The Governors' Gallery, http://governors.library.ca.gov/ (last visited Dec. 11, 2017). Governor Irwin served from 1875 until 1880 before passing away in 1886. Id.

[4] The purpose of Form 945 is to report federal income tax withheld on nonpayroll payments, which are often reported on Form 1099-MISC. United States Treasury, Instructions for Form 945 (2015), at 2.

- Form 945, calendar year 2015—$1 billion, id. at 33.

No payment was included with any of the returns, and the IRS assessed interest and penalties for late filing, late payment, and failure to make deposits. Id. at 26-34. The Trust was also assessed civil penalties for filing frivolous returns. Id. at 37; Compl. Ex. A at 6; Compl. Ex. E at 17; Compl. Ex. F at 19-20. The civil filing penalties were later removed. Compl. Ex. K at 32; Pl.'s Resp. Ex. B at 38. Plaintiff argues that the IRS Notice CP210 informing plaintiff that the 2015 civil penalties against the Trust were removed effectively "certified" plaintiff as a "bona fide billionaire." Compl. Ex. K at 32-34.

On or about May 23, 2016, an amended 2015 Form 945 was filed for the Trust. Def.'s Mot. to Dismiss ("Def.'s Mot.") Ex. 7 at 2. The Trust's Form 945 tax liability, including interest and penalties, was subsequently abated in their entirety for the 2015 tax year. Id. at 3-4.

After the IRS issued notices of balance due for the Trust's outstanding Form 941 liabilities, see, e.g., Compl. Ex. D at 14, plaintiff purported to pay his 2015 estimated tax liability for Form 1041, U.S. Income Tax Return for Estates and Trusts, by mailing four Forms 1041-ES, 2015 Payment Voucher, to the IRS on or about December 31, 2016. Pl.'s Resp. Ex. C at 46-47. As payment, plaintiff attached a "Performance Bond for Other Than Construction Contracts" to each of the four vouchers. Id. at 49-71. Each performance bond purported to obligate the Trust to pay the IRS approximately $25 to $26 billion out of the Instrument. See, e.g., id. at 49, 52.

On or about February 2, 2017, plaintiff filed Form 843, Claim for Refund and Request for Abatement, seeking a refund of Form 941, 1040, 1040X, and 1041 taxes for the 2015 calendar year in the amount of approximately $391 million. Pl.'s Resp. Ex. D at 74. Plaintiff did not provide any basis for the refund beyond referring to "records on file." Id. The IRS denied plaintiff's refund request on March 1, 2017, and assessed a $5,000 civil penalty for filing a frivolous return. Compl. Ex. M at 40-42. Plaintiff responded on March 7, 2017, contending that the IRS had previously determined his filings were not frivolous. Id. at 40.

Amended Forms 941 were filed on behalf of the Trust on or about May 8, 2017. Def.'s Mot. Ex. 6 at 2-3. The Trust's entire Form 941 tax liability, including interest and penalties, was subsequently abated for each quarter of the 2015 tax year.[5] Def.'s Mot. Exs. 3-6.

Plaintiff then filed a Form 1041 on behalf of the Trust for the 2015 calendar year. Pl.'s Resp. Ex. B at 40-44. The Trust's 2015 Form 1041 was dated May 22, 2017, and received by the IRS on June 9, 2017. Id. at 39-40. The return reported the following items:

- OID interest income—$102,720,000,000;

- Fiduciary fees—$5,162,202,116;

---

[5] An abatement reverses an unpaid assessment of a tax liability; it is not a credit as a result of a payment. See Treas. Reg. § 301.6404-1(a) (2016).

- Income distribution deduction—$48,778,898,941;

- Total tax—$30,687,112,110;

- Federal income tax withheld from Forms 1099— $102,720,000,000;

- Estimated tax penalty—$15,408,000,000; and

- Refund due—$53,941,101,060.

Id. at 40. In figuring the Trust's tax liability, plaintiff reported $12,834,032,970 in "employment taxes" from Forms 941, 941X, and 945. Id. at 41. In addition, the Schedules K-1, Beneficiary's Share of Income, Deductions, Credits, etc., attached to the return showed interest income of $48,778,898,940 to the IRS, $48,778,898,940 to the California Franchise Tax Board, and $5,162,202,116 to plaintiff. Id. at 42-44. Plaintiff alleges that he continues to cause $129,046,224 in payroll taxes to be deposited semiweekly using his "trade secret" method of payment, Compl. ¶ 11, which apparently involves issuing "payment bonds" against the Instrument.

Plaintiff filed suit in this court on June 6, 2017, seeking a refund of $1,208,796,038 in overpaid taxes as a result of his $5.2 billion "fiduciary fee." Compl. 4. Defendant moved to dismiss the suit on September 27, 2017, arguing generally that neither plaintiff nor the Trust ever paid any tax liabilities, and thus this court lacks jurisdiction to entertain plaintiff's complaint. Def.'s Mot. 3. The motion is now fully briefed, and the court considers oral argument unnecessary.

## II. LEGAL STANDARDS

### A. Pro Se Plaintiffs

Pro se pleadings are "held to less stringent standards than formal pleadings drafted by lawyers" and are "to be liberally construed." Erickson v. Pardus, 551 U.S. 89, 94 (2007) (per curiam) (internal quotation marks omitted). However, the "leniency afforded to a pro se litigant with respect to mere formalities does not relieve the burden to meet jurisdictional requirements." Minehan v. United States, 75 Fed. Cl. 249, 253 (2007); accord Henke v. United States, 60 F.3d 795, 799 (Fed. Cir. 1995) ("The fact that [the plaintiff] acted pro se in the drafting of his complaint may explain its ambiguities, but it does not excuse its failures, if such there be."). In other words, a pro se plaintiff is not excused from its burden of proving, by a preponderance of evidence, that the court possesses jurisdiction. See McNutt v. Gen. Motors Acceptance Corp., 298 U.S. 178, 179 (1936); Banks v. United States, 741 F.3d 1268, 1277 (Fed. Cir. 2014) (citing Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 748 (Fed. Cir. 1988)).

### B. Standard of Review Under RCFC 12(b)(1)

In determining whether subject matter jurisdiction exists, the court "must accept as true all undisputed facts asserted in the plaintiff's complaint and draw all reasonable inferences in favor of the plaintiff." Trusted Integration, Inc. v. United States, 659 F.3d 1159, 1163 (Fed. Cir. 2011). With respect to a motion to dismiss for lack of subject matter jurisdiction pursuant to RCFC 12(b)(1), the plaintiff bears the burden of proving, by a preponderance of evidence, that the court possesses subject matter jurisdiction. Id. The court is not limited to the pleadings in considering subject matter jurisdiction. Banks, 741 F.3d at 1277; Pucciariello v. United States, 116 Fed. Cl. 390, 400 (2014). If the court finds that it lacks subject matter jurisdiction over a claim, RCFC 12(h)(3) requires the court to dismiss that claim.

### C. Subject Matter Jurisdiction

Whether the court possesses jurisdiction to decide the merits of a case is a "threshold matter." Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94-95 (1998). Subject matter jurisdiction cannot be waived or forfeited because it "involves a court's power to hear a case." United States v. Cotton, 535 U.S. 625, 630 (2002), quoted in Arbaugh v. Y&H Corp., 546 U.S. 500, 514 (2006). "Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." Ex parte McCardle, 74 U.S. (7 Wall) 506, 514 (1868). Therefore, it is "an inflexible matter that must be considered before proceeding to evaluate the merits of a case." Matthews v. United States, 72 Fed. Cl. 274, 278 (2006); accord K-Con Bldg. Sys., Inc. v. United States, 778 F.3d 1000, 1004-05 (Fed. Cir. 2015). Either party, or the court sua sponte, may challenge the court's subject matter jurisdiction at any time. Arbaugh, 546 U.S. at 506.

### D. Tucker Act

The ability of the Court of Federal Claims to entertain suits against the United States is limited. "The United States, as sovereign, is immune from suit save as it consents to be sued." United States v. Sherwood, 312 U.S. 584, 586 (1941). The waiver of immunity "may not be inferred, but must be unequivocally expressed." United States v. White Mountain Apache Tribe, 537 U.S. 465, 472 (2003). Further, "[w]hen waiver legislation contains a statute of limitations, the limitations provision constitutes a condition on the waiver of sovereign immunity." Block v. North Dakota ex rel. Bd. of Univ. & Sch. Lands, 461 U.S. 273, 287 (1983).

The Tucker Act, the principal statute governing the jurisdiction of this court, waives sovereign immunity for claims against the United States, not sounding in tort, that are founded upon the Constitution, a federal statute or regulation, or an express or implied contract with the United States. 28 U.S.C. § 1491(a)(1) (2012); White Mountain, 537 U.S. at 472. However, the Tucker Act is merely a jurisdictional statute and "does not create any substantive right enforceable against the United States for money damages." United States v. Testan, 424 U.S. 392, 398 (1976). Instead, the substantive right must appear in another source of law, such as a

"money-mandating constitutional provision, statute or regulation that has been violated, or an express or implied contract with the United States." Loveladies Harbor, Inc. v. United States, 27 F.3d 1545, 1554 (Fed. Cir. 1994) (en banc).

### E. Tax Refund Suits

Congress has granted the Court of Federal Claims the authority to entertain tax refund suits. 28 U.S.C. § 1346(a)(1); United States v. Clintwood Elkhorn Mining Co., 553 U.S. 1, 4 (2008). To bring a tax refund suit, a plaintiff must:

- make full payment of its tax liabilities, Flora v. United States, 357 U.S. 63, 75 (1958);

- file a timely claim for refund with the IRS, I.R.C. § 7422(a) (2012); and

- file a timely complaint after the refund claim is denied or deemed denied, I.R.C. § 6532(a).

Plaintiffs filing a tax refund suit in the Court of Federal Claims must include the following with the complaint:

(1) a copy of the claim for refund, and

(2) a statement identifying:

(A) the tax year(s) for which a refund is sought;

(B) the amount, date, and place of each payment to be refunded;

(C) the date and place the return was filed, if any;

(D) the name, address, and identification number (under seal) of the taxpayer(s) appearing on the return;

(E) the date and place the claim for refund was filed; and

(F) the identification number (under seal) of each plaintiff, if different from the identification number of the taxpayer.

RCFC 9(m).

## III. DISCUSSION

Plaintiff has substantially complied with the pleading requirements of RCFC 9(m). In addition, the court assumes (without deciding) that plaintiff has satisfied the second and third jurisdictional prerequisites—filing a timely refund claim with the IRS and filing a timely complaint following denial of that claim—because (1) taxes were allegedly paid on December 31, 2016, (2) plaintiff filed a refund claim with the IRS on February 2, 2017, (3) the refund claim was denied on March 1, 2017, and (4) plaintiff's complaint was filed in this court on June 6, 2017.[6] However, that does not end the court's jurisdictional inquiry. Rather, the court must still determine whether the Trust has fully paid its tax liabilities prior to the filing of the complaint.

Under the full payment rule, a court's jurisdiction over tax refund claims is limited to those claims where the taxpayer has fully paid all taxes assessed for the tax year at issue prior to filing suit. Flora, 357 U.S. at 75. In other words, "payment of the assessed taxes in full is a prerequisite to bringing a refund claim." Ledford v. United States, 297 F.3d 1378, 1382 (Fed. Cir. 2002); accord Artuso v. United States, 80 Fed. Cl. 336, 338 (2008) ("A refund suit is exactly what the descriptive term implies. Under the 'full payment rule' a plaintiff must have fully paid the tax, penalties, and interest at issue.").

Plaintiff alleges that defendant is in possession of "money had and received from plaintiff," Pl.'s Resp. 1, as a result of the purported performance bonds that plaintiff has posted. Plaintiff is correct that remittance of a bond can be used to satisfy tax liabilities (although the term "bond" is no longer used). Pursuant to I.R.C. § 6603(a), taxpayers "may make a cash deposit . . . to pay any tax . . . which has not been assessed at the time of the deposit" (emphasis added).[7] Deposits not used for the payment of tax may be refunded upon request. I.R.C. § 6603(c). Taxpayers may make such a deposit by "remitting to the [IRS] . . . a check or a money order accompanied by a written statement designating the remittance as a deposit. The written statement also must include: (a) [t]he type(s) of tax; (b) [t]he tax year(s); and (c) [a] statement . . . identifying the amount of and basis for the disputable tax." Rev. Proc. 2005-18, § 4.01(1), 2005-1 C.B. 798. Remittances not designated as a deposit are treated as payments and applied against outstanding tax liabilities, including penalties and interest. Id. § 4.01(2). The term "cash bond" was previously used, in now-superseded Revenue Procedure 84-52, 1984-1 C.B. 551, to describe deposits made to suspend interest accrual. Id. § 2.06.

Plaintiff is also correct that "[u]sing an eligible obligation instead of a surety bond for security is the same as using[, among other options,] cash." 31 U.S.C. § 9303(c) (2012).

---

[6] Plaintiff does not appear to have filed a valid refund claim pursuant to Treas. Reg. § 301.6402-2(b)(1). However, because defendant did not contest the validity of plaintiff's refund claim, the court assumes (without deciding) that plaintiff's refund claim was valid.

[7] I.R.C. § 7103 describes several situations in which the IRS may accept a bond. None of these situations is applicable to the instant case. For example, pursuant to I.R.C. § 7485(a), taxpayers may file a bond to stay assessment and collection of tax deficiencies during the pendency of an appeal of a United States Tax Court decision.

Plaintiff asserts that the purported performance bonds he submitted with Forms 1041-ES are eligible obligations, and thus constituted payment of his tax liabilities. Pl.'s Resp. 5. However, plaintiff's reasoning is off point for two reasons. First, I.R.C. § 6603 provides that deposits must be made in cash, and Revenue Procedure 2005-18 makes no allowance for posting a surety bond (or any other type of bond) in lieu of a check or money order. Second, even if a surety bond was permissible, an "eligible obligation" equivalent must, among other requirements, "have a market value that is equal to or greater than the amount of the required surety bond," with the market value of the obligation being "determined by the Secretary of the Treasury." 31 U.S.C. § 9303(a)(2). The IRS, which is under the direction of the Secretary of the Treasury, has effectively determined that the "bonds" submitted by plaintiff have no market value.

Plaintiff's tax refund case thus boils down to the value of plaintiff's purported bonds, which depend on the value of the Instrument. The court finds that the Instrument—and, by extension, plaintiff's "bonds"—are entirely frivolous in nature. Frivolous claims include those that describe "fantastic or delusional scenarios." Neitzke v. Williams, 490 U.S. 319, 328 (1989); accord Taylor v. United States, 568 F. App'x 890, 891 (Fed. Cir. 2014) (unpublished decision) ("Frivolous complaints include those in which the factual allegations asserted are so unbelievable that there is no need for an evidentiary hearing to determine their veracity."). Plaintiff's allegations concerning the Instrument—that a person can generate $850 billion simply by "finding" a writing and affixing the signature of a governor who has been dead for over a century—amount to a quintessential frivolous claim.

In other words, the Instrument has no value and thus cannot be used as a vehicle to pay tax liabilities. Plaintiff's claims are wholly meritless.

## IV. CONCLUSION

The court has considered all of the parties' arguments. To the extent not discussed herein, they are unpersuasive, without merit, or immaterial.

Plaintiff has failed to demonstrate that he paid the tax liabilities at issue prior to initiating the instant refund action. Plaintiff's claims before this court are so implausible and devoid of merit as to not give rise to a federal controversy. Therefore, the court **GRANTS** defendant's motion to dismiss for lack of subject matter jurisdiction. The court also **DENIES AS MOOT** all other pending motions.

Plaintiff's complaint is **DISMISSED WITHOUT PREJUDICE**. No costs. The clerk is directed to enter judgment accordingly.

**IT IS SO ORDERED.**

MARGARET M. SWEENEY
Judge